858 F.2d 308
 23 Soc.Sec.Rep.Ser. 285, Medicare&Medicaid Gu 37,442
ASSOCIATION OF SEAT LIFT MANUFACTURERS, a trade association,
Halsom Home Care, a corporation, and Hudson Home
Health Care, Inc., a corporation,
Plaintiffs- Appellants,
v.
Otis R. BOWEN, Secretary of Health and Human Services, et
al., Defendants- Appellees.
 No. 87-3149.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 15, 1988.
Decided Sept. 23, 1988.
 
 Kenneth Berlin (argued), Paul Bousquet (Lead), Winston & Strawn, Washington, D.C., Charles M. Rosenberg, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for plaintiffs-appellants.
 Marcia W. Johnson, Annette G. Butler, Arthur I. Harris, Asst. U.S. Attys., Cleveland, Ohio, Alan S. Dorn (argued), Chicago, Ill., for defendants-appellees.
 Before ENGEL, Chief Judge*, KENNEDY and KRUPANSKY, Circuit Judges.
 KRUPANSKY, Circuit Judge.
 
 
 1
 This action arises under Title XVIII of the Social Security Act 42 U.S.C.A. Sec. 1395 et seq., (West 1983) commonly referred to as Medicare (hereinafter Program) wherein the appellants seek to vacate a determination by Nationwide Mutual Insurance Company (Carrier), the Part B Ohio Medicare Carrier, fixing the allowable "reasonable charge" for a seat lift chair payable to Medicare beneficiaries under Part B of the Program in Ohio at $869.51. On January 30, 1987, the district court dismissed the action for lack of jurisdiction citing to the Supreme Court decision in Bowen v. Michigan Academy of Family of Physicians, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) wherein it was held that Congress intended to bar judicial review of the "amount of benefits" to be awarded under Part B of the Program, which determinations were delegated to the Carrier acting in conformity with regulations and instructions of the Secretary.[1] The Court did not, however, exclude from judicial review challenges to the validity of the Secretary's regulations, instructions, and to the methodology implemented in deriving the "amount of benefits." See United States v. Erika, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). Part B of the Program and its implementing regulations set forth a number of conditions and limitations on the coverage of listed services and items, (42 U.S.C.A. Sec. 1395k, 1395l, 1395x(v) (West 1983 & Supp.1988)), exclude certain services and items from coverage (42 U.S.C.A. Sec. 1395g (West 1983)), and specify several limits on what is characterized as the reimbursable "reasonable charge" for covered services and items (42 U.S.C.A. 1395u(b)(West Supp.1988)). See also 42 C.F.R. 405.501 et seq. (1987). The Health Care Financing Administration (HCFA) has explained and clarified these criteria in the Part B Carrier's Manual, issued pursuant to the Secretary of Health and Human Services' (Secretary) interpretive rulemaking authority. See 5 U.S.C.A. Sec. 553; 42 U.S.C.A. Secs. 1302, 1395hh (West 1983 & Supp.1988).
 
 
 2
 Among the statutory limitations on Part B coverage, 42 U.S.C.A. Sec. 1395y(a)(1)(A) (West Supp.1988) prohibits payment for medical services or items which, although within the general scope of coverage, are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. Sec. 405.310(k)(1) (1987). A seat lift chair may be covered as an item of "durable medical equipment",[2] but only under circumstances where it is medically necessary under such criteria. Reimbursement is available only in those limited circumstances where a beneficiary has severe arthritis of the knees or hips, muscular dystrophy, or similar neuromuscular disease; where the chair is included in a physician's course of treatment and is likely to effect improvement or arrest deterioration of the patient's condition; and where the beneficiary would otherwise be bed or chair confined. Part B Carrier's Manual, Coverage Issues Appendix Sec. 60.8 (1978). Accordingly, the seat lift chair may not be covered as a comfort or convenience item, but must be part of a course of treatment for a beneficiary who otherwise would be unable to arise and ambulate in order to improve or arrest deterioration of a severely arthritic condition.
 
 
 3
 The Secretary has delegated to the Part B Carrier the authority to determine whether a claimed service or item is medically necessary and is otherwise covered under Part B, and to fix the "reasonable charge" that may be paid for covered services and items. 42 U.S.C.A. Sec. 1395u(a) (West Supp.1988); 42 C.F.R. Sec. 405.803, 421.200 (1987). In performing these responsibilities, the Carrier applies the coverage and reimbursement criteria prescribed by the enabling statute and the Secretary. The Carrier is reimbursed by the Secretary for costs of claim administration, and pays: (1) the charge for a comparable service or item applicable to the Carrier's own policyholders (42 U.S.C.A. Sec. 1395u(b)(3)(B) (West Supp.1988)); (2) the supplier's "customary charge" for the service or item during the "base year" that precedes the "fee screen" year, 42 U.S.C.A. Sec. 1395u(b)(3)(F) (West Supp.1988) or (3) the "prevailing" charge in the designated locality during the base year that precedes the fee screen year. Id.
 
 
 4
 The Secretary may also designate services or items that do not vary in quality among suppliers. For such items, the statute establishes a "lowest charge level" (LCL) limit upon the "reasonable charge" which can be imposed. Each Carrier submits for the item an LCL set at the 25th percentile of actual Medicare charges in the locality. The statute does not confine the Carrier to any of the four "reasonable charge" standards ("comparable charge," "customary charge," "prevailing charge," or LCL). Instead, the Carrier may consider not only the four aforementioned fee screens, but also:
 
 
 5
 Other factors that may be found necessary and appropriate with respect to a category of service to use in judging whether the charge is inherently reasonable. This includes special reasonable charge limits.
 
 
 6
 42 C.F.R. Sec. 405.502(a)(7)(1987).
 
 
 7
 The regulations further state that Carriers are accorded "flexibility" in determining reasonable charges. 42 C.F.R. Sec. 405.502(a) (1987). Carriers must "exercise [their] judgment based on factual data on the charges made by [suppliers] to patients generally and by other persons to the public in general and on special factors that may exist in individual cases." Sec. 405.502(a)(10)(c) (1987). If the customary and prevailing methodology has yielded a result that is inherently unreasonable, the Carrier may use any available relevant information.[3]
 
 
 8
 Thus, the Carrier is given wide discretionary judgment to consider "inherent reasonableness" criteria under those circumstances where use of customary and prevailing charge data alone would result in unreasonable costs. The Secretary considers inherent reasonableness criteria under circumstances where the charges for the item in the locality are substantially out of line with charges elsewhere; where Medicare is the sole or primary source of payment for the item; where the charges do not reflect the influence of a competitive marketplace (i.e., the market is "dominated" by one or a few suppliers); where there have been sudden increases in charges that cannot be readily explained by normal economic factors such as inflation; where the charges are substantially in excess of acquisition or production costs; or where charges for the item are substantially higher to Medicare beneficiaries than to others. Thus, under circumstances where the customary and prevailing charge methodology of the enabling statute has yielded a result that is not inherently reasonable, the Carrier may exercise its discretionary responsibility and use any available relevant information and apply reasonable assumptions in establishing a reasonable charge. Information the carrier may consider includes the supplier's acquisition or production costs, the charges of suppliers who service essentially a non-Medicare market, manufacturer's suggested retail prices, charges made by suppliers in other market areas, the Medicare allowance provided for the least expensive item that meets the patients' medical needs, as well as other impacting criteria that reasonable minds would consider in determining a "reasonable charge".[4]
 
 
 9
 Prior to August 1985, the maximum reasonable charge allowable for seat lift chairs under the Medicare Part B Program in the state of Ohio was determined either on the basis of the "customary charge" fee screen (the amount a particular supplier charged medicare customers during the previous year), or on the basis of the "prevailing charge" fee screen (the 75th percentile of all customary charges). These screens in Ohio ranged from $1,150.00 to $2,262.00.
 
 
 10
 The record discloses that beginning in early 1984, a number of medical equipment suppliers, including Cincinnati-based Queen City Home Health Care, embarked upon a concentrated and widespread television advertising campaign promoting seat lift chairs in Ohio and other states. The promotion was directed to Medicare beneficiaries rather than to prescribing physicians and promoted seat lift chairs "at no cost, absolutely no cost" with a qualifying medical condition and supplemental insurance. Queen City mailed its preprinted prescription form, upon the telephone request of beneficiaries, to the beneficiary's physician for signature and delivered the "no cost" seat lift chair, and filed and assigned claims with Nationwide Mutual Insurance Company, the Ohio Part B Carrier.
 
 
 11
 During April 1985, while the Carrier's "Support Service Division" was compiling charged data for the April 1984-March 1985 base period necessary to calculate the prevailing charge level for services and items for the forthcoming 1986 fee screen year, it noticed a significant escalation in the number of seat lift chair claims, along with numerous complaints and inquiries from beneficiaries' physicians, members of Congress and the media concerning medical equipment suppliers, advertising, and the quality and cost of seat lift chairs. The Carrier's review disclosed that during the first calendar quarter of 1985, Queen City Home Health Care [Queen City] of Cincinnati alone billed $13 million in assigned Medicare claims, mostly for seat lift chairs; beneficiaries also initiated numerous complaints, most regarding the excessive cost of up to $2,400.00 per seat lift chair; comparable items were available from local sources at costs as low as $995.00 per chair.
 
 
 12
 In April, 1985, before the HCFA contacted Nationwide, its survey had reflected that seat lift chair sales increased from 276 in 1982 to 513 in 1983. The cost of chairs dropped to $1,695 from $2,132. However, during the April, 1984 to March, 1985 period, the number of chairs paid for by Medicare jumped to 11,504, from 513 in a comparable period a year earlier. Charges escalated from an average of $1,695 to $2,400. Because Queen City Home Health Care dominated three-fourths of the pertinent seat lift market, Queen City effectively determined the prevailing charge and the customary charge--both of which had increased dramatically over the previous year. The Carrier concluded that the increase failed to reflect the influence of a competitive market. Queen City's "prevailing charge" in particular was excessive--$2,400. Nationwide's review found that the prevailing charge level in Indiana was $1,168 and in Michigan, $1,295 and $1,716--far below the $2,400 prevailing charge in Ohio. Its investigation ultimately prompted it to conclude that further measures in addition to applying the standard reimbursement methodology were necessary to assure payment of only a "reasonable charge," and proposed three alternative measures: (1) subjecting seat lift chairs to the lowest charge level provisions; (2) limiting yearly increases in prevailing charge levels for durable medical equipment by an economic index; and (3) establishing an "inherently reasonable" charge, also referred to as a "Level III ceiling," for seat lifts and other durable medical equipment based on the lowest manufacturer's suggested retail price for the item.
 
 
 13
 After the Carrier had undertaken its review, the Health Care Financing Administration (HCFA) advised all regional Carriers to closely scrutinize seat lift chair claims. William Desmarais (Desmarais), Director of HCFA's Bureau of Eligibility, Reimbursement and Coverage, wrote to Regional Administrators of HCFA on May 30, 1985, advising Carriers that the reasonable charge for seat lift chairs should not exceed the least expensive alternative that satisfied the patients' needs. This letter was a "confirmation" of Nationwide's recommendation to establish a Level III ceiling. See Carruthers' Affidavit of September 24, 1986 at p 15. The letter advised administrators to "take into account" catalogue prices for seat lift chairs and noted that it would not be "inherently reasonable" to allow more than the catalogue price unless special medical justifications were present. The Desmarais memorandum advised each Regional Administrator to remind Carriers to review seat lift chair claims, and if necessary obtain additional medical evidence, to establish that a given chair satisfied the medical necessity criteria set forth in the Carrier's Manual and was not merely a personal comfort item. The review was necessary, he explained, because seat lift chair orders were being solicited by suppliers rather than originating with physicians, who were simply sent supplier-generated checklists for their signature. With respect to supplier charges, the Desmarais memorandum cited the "inherent reasonableness" criterion of 42 C.F.R. Sec. 405.502(a)(7) and explained that under this criterion, charges could not exceed the allowance for the least expensive alternative that met a patient's medical needs and was available to beneficiaries. The Desmarais memorandum alluded to the catalogue prices of four seat lift chair models as "examples" of how Carriers could apply the inherent reasonableness criterion, and stated that "in this example" it would not be inherently reasonable to allow more than the charge for a standard model ($749.95), plus shipping, absent medical justification for more expensive models in individual cases.
 
 
 14
 In a subsequent memorandum to the Chicago HCFA Regional Administrator dated June 7, 1985, Desmarais stated that application of the inherent reasonableness criterion "should be considered" by Carriers in determining allowable charges for seat lift chairs and further observed that prior HCFA memoranda "were intended to increase Carrier awareness" of their longstanding authority to apply inherent reasonableness "and to give them [Carriers] examples of how this might be done." The memorandum specifically acknowledged HCFA's own lack of current authority to direct specific national "inherent reasonableness" limits which would be mandatory on Carriers, and noted instead that it was within the sole discretion of each individual Carrier to derive its own "inherent reasonableness" determination at its service level.
 
 
 15
 Subsequent to the two Desmarais memoranda, the Associate Regional Administrator for HCFA circulated a letter in June 1985 to all Carriers in the Chicago region (including Nationwide) discussing the review of seat lift chair claims and the determination of allowable reasonable charges. As with the Desmarais memoranda, the HCFA regional letter emphasized the Carriers' exclusive authority to determine "inherently reasonable" charges, and cited Sears as well as Montgomery Ward as an "example" of available sources of seat lift chairs that Carriers could utilize in determining if Medicare charges in their service areas were "inherently reasonable." The HCFA regional letter requested each Carrier to apply the inherent reasonableness criterion to its allowances, using the information provided, "as appropriate." Carriers were further requested to inform the regional office of their reasonable charge allowances and the basis for their determinations.
 
 
 16
 Following receipt of the HCFA regional letter, Nationwide, which previously had been reviewing charge data and other information to determine the reasonableness of seat lift chair charges, proceeded to derive its "inherently reasonable" charge for seat lift chairs. The HCFA regional letter had confirmed Nationwide's own prior proposal to establish an "inherently reasonable" charge based on its earlier conclusions that the Medicare prevailing charge level of $2,400, based on supplier charges during the April 1984-March 1985 base period, was excessive. In addition to the information previously considered, the Carrier's staff surveyed several sources of seat lift chairs including those suggested in the HCFA regional letter. Sciotec, Inc., a major manufacturer of durable medical equipment, advised Nationwide that its wholesale, or dealer list, price for a standard seat lift chair was $450, and furnished brochures.[5] Pride Health Care, Inc., another durable medical equipment manufacturer, furnished a dealer price list indicating a dealer list price of $575 for a standard seat lift chair. A third manufacturer, Action Lift Chair, Inc., provided information indicating a dealer list price for a standard seat lift chair of $850 for one to three units, which decreased as additional units were purchased.
 
 
 17
 The Carrier's staff also contacted several national catalogue houses which disclosed that J.C. Penney and Spiegel did not sell durable medical equipment. Montgomery Ward advertised a seat lift chair in its Fall/Winter 1985 catalogue for $799.95 plus shipping. Sears offered a standard upright seat lift chair in its 1985/1986 Home Health Care "Specialog" for $749.95 plus shipping and assembly. The "Specialog" indicated that the entire chair (rather than just the seat) lifted in order to elevate an individual to a standing position. Nationwide concluded that the Sears standard chair would cost $869.51, including Ohio State sales tax of $53.10; shipping charges of $26.46, based upon weight, from a Sears store to a purchaser's home (Sears' personnel indicated that Sears paid shipping charges from the manufacturer to the store); and assembly charges of $40 based on an assumption that beneficiaries would not be able to assemble the chair.
 
 
 18
 Having considered the entire formidable compendium of statistical and comparative information collected during its comprehensive survey including: the pattern of Medicare claims and charges; the sudden rise in Medicare prevailing charges to excessive amounts; the noncompetitive nature of the Ohio Medicare market; Medicare charges in other states; manufacturers' suggested retail prices; wholesale costs; and the charges of national retail suppliers operating in a competitive, non-captive Medicare market, Nationwide was satisfied that the Sears basic seat lift chair satisfied a beneficiary's medical needs, was generally available to the beneficiary population, and at $869.51 was the least expensive alternative. It therefore concluded that $869.51 was an "inherently reasonable" charge.
 
 
 19
 Following its determination, the Carrier in July 1985 prepared a letter to HCFA stating the basis for its "inherently reasonable charge" for seat lift chairs within its assigned territory. On July 10, 1985, Nationwide issued a newsletter to suppliers advising them of its decision to implement an "inherently reasonable" charge screen of $869.51 for seat lift chairs, applicable to chairs furnished to beneficiaries on or after August 19, 1985. By letter dated July 25, 1985, counsel for the newly formed "Association of Seat Lift Manufacturers" demanded that the Carrier immediately rescind its decision, asserting that Nationwide had failed to comply with the procedures for setting a "lowest charge level." When the Carrier did not rescind its decision, the association filed the instant action on August 12, 1985.
 
 
 20
 It is fundamental that "jurisdiction to review Medicare reimbursement determinations is available only as prescribed in the Medicare Act." Riley Hospital & Benevolent Assoc. v. Bowen, 804 F.2d 302, 304 (5th Cir.1986) (citing Heckler v. Ringer, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984)). "Appeals from adverse determinations on cost reimbursement under the Medicare Act may be had only as specifically set forth by Congress." Riley Hospital, 804 F.2d at 305.
 
 
 21
 In applying this principle, the Supreme Court in United States v. Erika, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), announced that the Medicare statute precluded federal court jurisdiction over determinations of the "amount of benefits" that were payable under Part B of the Act. The Court relied upon the "precisely drawn provisions" of 42 U.S.C.A. Sec. 1395ff(b) (West 1983), which provided for hearings by the Secretary and judicial review regarding general eligibility to participate in Part A and Part B, and the amount of benefits payable under Part A, but "conspicuously" failed to authorize such administrative or judicial review of Part B payment determinations. 456 U.S. at 207-208, 102 S.Ct. at 1653-1654. The Court concluded that the "omission" provided "persuasive evidence" that Congress intended to foreclose judicial review of such determinations, and reasoned that the legislative history of Sec. 1395ff(b) confirmed this conclusion. Id. at 208-211, 102 S.Ct. at 1654-1656. Accordingly, the Court decided that a Part B supplier's challenge to a Carrier's interpretation and application of the statutory and regulatory "reasonable charge" provisions, which the supplier cited as a basis for contesting the "amount of benefits," was precluded by the statute.
 
 
 22
 Subsequent to its decision in Erika, the Supreme Court affirmed this Circuit's decision in Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) where it defined the test for preclusion of judicial review of Medicare, Part B payment determinations. In Michigan Academy, the Supreme Court mandated judicial review under circumstances where a supplier's claim could not be adjudicated at a Carrier "fair hearing" prescribed by the statute.[6] In that case, the court authorized judicial review for challenges to eight HCFA statutes, regulations or instructions and for challenges to the reasonable charge determination methodology employed by the Carrier in deriving a reasonable charge for services for durable medical equipment.
 
 
 23
 In the instant case, the appellants, as in Erika, 456 U.S. at 201, 102 S.Ct. at 1651, did not allege the invalidity of any statutory or regulatory provision. Appellants challenged only the derivation of the "reasonable charge" for seat lift chairs, charging that it was promulgated by the Carrier pursuant to specific instructions of HCFA, or in the alternative, that the methodology employed by Nationwide violated applicable HCFA regulations, thereby justifying judicial review. Appellants concisely defined the issue in the following language:
 
 
 24
 If this Court finds that the instant case does not involve a challenge to HCFA's instructions, this Court must decide whether the instant case involves on the one hand a challenge to the reasonable charge determination methodology or on the other hand only a challenge to a benefit amount determination. Because appellants have alleged that the methodology employed by Nationwide violates HCFA regulations judicial review is permissible in the instant case.
 
 
 25
 In the instant case, Nationwide determined a "reasonable charge" of $869.51 for a seat lift chair, based on the "inherent reasonableness" criterion of 42 C.F.R. Sec. 405.502(a)(7)(1987) and its consideration of numerous "other factors" under that criterion including, but not limited to, the retail price of a Sears seat lift chair. As the district court noted, plaintiffs did not challenge the Carrier's authority to establish allowable charges on an inherently reasonable basis, and did not challenge the validity of any other statutory or regulatory provision. Nor did plaintiffs challenge any instruction set forth in the Part B Carrier's Manual. Rather, as in Erika, the instant plaintiffs have alleged that the Carrier's specific "amount determination" was erroneous under the statute and regulations because it conflicted with other allegedly applicable regulatory criteria (the lowest charge level provisions) and failed to consider certain allegedly relevant factors (such as the number of seat lifts sold by Sears and the comparative overhead costs of Sears and other suppliers).
 
 
 26
 On appeal, plaintiffs primarily asserted that the district court erred because "HCFA specifically instructed Nationwide to determine the reasonable charge for seat lift chairs ... on the basis of the Sears catalogue price." Plaintiffs also argued that even if the present case does not involve a challenge to HCFA regulations or instructions, jurisdiction is available on three alternate grounds. Initially they claimed that their challenge is to only the "methodology" employed by the Carrier, and, accordingly, is subject to review under Michigan Academy. Second, they suggested that even if their challenge can be judged at a Carrier "fair hearing," that challenge is not--in monetary terms--the "minor" or "trivial" one that was congressional focus in enacting Sec. 1395ff. Finally, plaintiffs contended that this action involves a prospective challenge to the Carrier's "reasonable charge" determination by a group of manufacturers and suppliers, whereas Congress precluded review only of decisions on specific, individual retrospective claims.
 
 
 27
 A review of the record in its entirety, with particularity the Desmarais, the Gagel, and Stec memoranda and letters,[7] clearly reflects that HCFA did not "instruct" Nationwide to derive the allowable reasonable charge for seat lift chairs on the basis of the Sears catalogue price. The memoranda read in context were purely informational or advisory and specifically recognized that the HCFA lacked the regulatory authority to unilaterally promulgate national "reasonable" charges for a particular item or service. The agency was merely carrying out its general oversight role in assuring that Carriers apply pertinent statutes, regulations, and instructions in making such determinations, and brought pertinent information to the Carrier's attention for use in carrying out these responsibilities. Plaintiffs erroneously equated HCFA's exercise of that responsibility with a specific "directive" to set the allowable reasonable charge at the level of mail order catalogue prices. However, the record disclosed that Nationwide began its review of seat lift charges before the HCFA issued its advisory memoranda. In deposition testimony, Nationwide attested that it did not consider the memoranda to be a directive to establish a charge based on the Sears catalogue price. Nationwide asserted that the HCFA memoranda were merely a "confirmation" of its pre-existing policy. Moreover, in July, 1986, Nationwide actually pushed for a broader application of the inherently reasonable criteria than the HCFA had recommended. Nationwide sought to apply the criteria to all medical products for which catalogue prices were available.
 
 
 28
 In short, the Carrier made an independent determination of the reasonableness of Medicare charges for seat lifts after evaluation of numerous factors in addition to the Sears catalogue price recommended in the HCFA memoranda. That Nationwide ultimately concluded upon its independent evaluation that the Sears catalogue price represented an "inherently reasonable" charge does not mean that it did so at the specific "direction" of HCFA. Accordingly, the HCFA memoranda cannot be described as "instructions" or regulations and hence Michigan Academy is distinguishable.
 
 
 29
 Plaintiffs' first alternative argument is that the instant case involves the "method by which [Part B] amounts are to be determined" and that jurisdiction is, therefore, available under Michigan Academy. However, the Supreme Court's opinion in Michigan Academy concluded that challenges to statutes, regulations, and instructions prescribing Part B payment criteria, rather than challenges to the application of such criteria by Carriers in making Part B "payment determinations," were the only type of challenge that could not be adjudicated in a Carrier fair hearing. Because the instant plaintiffs essentially disputed only Nationwide's application of the "inherent reasonableness" criterion in determining the reasonable charge for seat lifts rather than the validity of that criterion itself, their so-called "method" challenge is actually a challenge to an amount determination and Erika, rather than Michigan Academy, is controlling. See Kuritzky v. Blue Shield of Western New York, 850 F.2d 126 (2d Cir.1988) ("method" challenge is only reviewable if it involves rules, regulations and statutes and not the carriers' method of applying the regulations).
 
 
 30
 Nor is it significant that the "amount determination" at bar involves a large sum of money. Applicable authority suggests that judicial review over all Part B amount determinations is precluded. While Congress acted on the basis that Part B payments "generally were expected to be smaller," see Erika, 456 U.S. at 208, 102 S.Ct. at 1654, it in fact precluded review of all Part B payment determinations prior to January 1, 1987, rather than only those specific determinations judged on a case-by-case basis to be "minor" or "trivial." The 1986 legislation, which provides for judicial review (subject to amount in controversy requirements and several other restrictions) only with respect to services and items furnished on or after January 1, 1987, supports this interpretation of prior law. The 1986 legislation specifically precluded judicial review of Nationwide's reasonable charge determination for seat lift chairs fixed prior to January 1, 1987, while it authorized judicial review of those charges which were established after that date.
 
 
 31
 This court also rejects plaintiffs' argument that jurisdiction is available over "prospective challenges" to the Secretary's decision. In reaffirming Erika the Supreme Court in Michigan Academy drew no distinction between prospective challenges and challenges arising in the context of an individual claim, where both challenges are directed at the Carrier's "payment determination" rather than at the Secretary's regulations or instructions. Plaintiffs cannot contend that the Carrier's reasonable charge determination is subject to review simply because they filed their challenge before the Carrier actually applied its determination to any individual claim.
 
 
 32
 Lastly, it is important to note that a Carrier fair hearing was available to adjudicate the validity of appellant's claims. A Part B supplier dissatisfied with a Carrier decision is entitled to an independent reconsideration by the Carrier and to a nonadversarial evidentiary hearing before a Carrier-appointed hearing officer. 42 C.F.R. Sec. 405.801 et seq (1987). The supplier may be represented by legal counsel, may examine all evidence presented by the Carrier, may cross-examine witnesses, and may file post-hearing statements. The hearing officer must adhere to all statutes and regulations and the Carrier must follow the hearing officer's decision which may not be revised by the Carrier or HCFA.
 
 
 33
 Crucially, Queen City Home Health Care invoked a Carrier hearing to review Nationwide's determination as applied to its assigned claims. On March 2, 1987, the hearing officer affirmed Nationwide's determination after considering Queen City's evidence and arguments at length.
 
 
 34
 In light of the foregoing, the instant case is readily distinguishable from Michigan Academy. That decision was anchored in part upon the lack of a hearing:
 
 
 35
 We conclude, therefore, that those matters which Congress did not leave to be determined in a "fair hearing" conducted by the carrier--including challenges to the validity of the Secretary's instructions and regulations--are not impliedly insulated from judicial review.
 
 
 36
 106 S.Ct. at 2140. Similarly distinguishable is the decision in Medical Fund-Philadelphia Geriatric Center v. Heckler, 804 F.2d 33 (3d Cir.1986). The Third Circuit instructed the lower court that "the district court must examine its jurisdiction over each claim on remand, as its jurisdiction depends on whether the claim lay outside the jurisdiction of the [Carrier] hearing officer." 804 F.2d at 39. Accordingly, the existence of a hearing in the instant case significantly undercuts any argument for federal court jurisdiction. See Kuritzky v. Blue Shield of Western New York, 850 F.2d 126 (2d Cir.1988) (Congress meant the hearing officer to be the final arbiter of Part B amount determination claims and if a hearing is available, judicial review is unavailable).
 
 
 37
 In summary, appellees did not "instruct" the Carrier in any way; its memoranda were merely informational and advisory. Nor is the instant challenge one to the "methodology" of the determination since the challenges did not involve the statutory or regulatory method used to determine a rate. In the instant case, as in Erika, only implementation of a method, not the method itself, was at issue.
 
 
 38
 Since a hearing was accorded to the instant claimant, Michigan Academy does not require this court to exercise jurisdiction. Accordingly, the decision of the lower court is AFFIRMED.
 
 
 
 *
 The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988
 
 
 [1]
 The instant appeal is governed by 42 U.S.C.A. Sec. 1395ff (West Supp.1988), which in turn refers to 42 U.S.C.A. Sec. 405(h) (West 1983). The latter provision reads as follows:
 (h) Finality of Secretary's decision.
 The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.
 The plain language of this provision appears to say that no finding of fact or decision shall be reviewed. See Bartlett v. Bowen, 816 F.2d 695, 713 (D.C.Cir.1987) (Bork, J., dissenting) ("there is no dispute that the judicial review provisions of the Medicare Act taken on their face, explicitly deny to any and all courts jurisdiction ...").
 
 
 [2]
 "Durable medical equipment" is defined as equipment that can withstand repeated use, primarily serves a medical purpose, is not useful in the absence of illness or injury and is appropriate for use in the home. 42 C.F.R. Sec. 405.514(b) (1987)
 
 
 [3]
 Because the inherent reasonableness criterion is available, the Secretary's decision need not conform to the LCL standards (the LCL methodology is only one of the alternatives available to the Secretary). Therefore, this court need not consider appellants' charge that the Secretary's seat lift policy did not meet the LCL guidelines
 
 
 [4]
 Following the Carrier's determination in the instant case, Congress amended 42 U.S.C.A. Sec. 1395u(b)(8) (West Supp.1988) to require the Secretary, through regulations, to describe the factors to be applied in determining a "reasonable charge" where application of the standard reasonable charge methodology results in charges that are not inherently reasonable, along with the factors to be used in establishing a "reasonable charge" in such cases. On August 11, 1986, the Secretary amended his regulations to comply with the congressional promulgation. 42 C.F.R. Sec. 405.502(a)(7), (g) (1986). The foregoing legislative and administrative enactments are of no consequence in the resolution of this appellate review; nor are the 1986 amendments to 42 U.S.C.A. Sec. 1395ff (West Supp.1988) which provide for limited administrative and judicial review of Part B payment determinations, effective for services and items furnished after January 1, 1987
 Any Part B beneficiary, physician or supplier accepting assignment, who is dissatisfied with a Carrier decision that a claimed item or service is not covered, or with a decision concerning the amount reimbursable for a covered item or service, is mandated an independent reconsideration by the Carrier and a nonadversarial, evidentiary hearing before a Carrier-appointed hearing officer. 42 C.F.R. Sec. 405.801 et seq. (1987). The beneficiary or supplier, who may be represented by counsel, may examine all evidence initially considered by the Carrier and present additional evidence and argument, produce and examine witnesses and file post-hearing statements in support of his position. 42 C.F.R. Sec. 405.830, 405.870 (1987). The hearing officer's disposition must be in accord with all statutory and regulatory provisions as well as HFCA instructions, policy statements, and other interpretive authorities. 42 C.F.R. Sec. 405.860 (1987). The disposition becomes a final order subject to reconsideration only by the hearing officer. 42 C.F.R. 405.835, 405.841 (1987).
 
 
 [5]
 Queen City, which furnished over 75 percent of the 11,504 seat lift chairs sold to Medicare beneficiaries in the April 1984--March 1985 base period, obtained its chairs at a wholesale cost of $450
 
 
 [6]
 See footnote 4
 
 
 [7]
 William Desmarais was Director of HCFA's Bureau of Eligibility, Reimbursements and Coverage; Barbara J. Gagel was Regional Administrator of HCFA's Region V and Judith Stec was Associate Regional Administrator of HCFA Region V during the time periods here in issue